FILED

2008 Apr-17  PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

DEBRA WILSON, as Administratrix of
the Estate of Kyle Wilson,

     PLAINTIFF,

v.                                 CASE NO. CV-05-J-1093-NW

COLBERT COUNTY BOARD OF
EDUCATION, et al.,

     DEFENDANTS.

## MEMORANDUM OPINION

This case comes before the court on the brief of the defendant[1] in support of its appeal of the due process hearing decision (doc. 70), the plaintiff's response (doc. 76) and the defendant's reply (doc. 80). The administrative proceedings leading up to this appeal began in 2003 when the plaintiff filed a request for a due process hearing with the defendant school board, under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* See 20 U.S.C. § 1415(f)(1).[2]

---

[1] The named defendants are the Colbert County Board of Education; Billy Husdon, the superintendent, in his individual capacity; and Thomas Windsor, the school principal, in his individual capacity. These defendants are jointly represented and refer to themselves in the singular. The court therefore denotes the term "defendant" to mean the named defendants, as a group.

[2] The case is before the court in two separate postures. The defendant seeks to have the decision of the hearing officer set aside, while the plaintiff seeks to recover attorney fees as the prevailing party of that hearing as well as compensatory damages. Since the student in question is now deceased, the issue of the appropriateness of the remedies ordered by the hearing officer for the violations found by him is moot.

This tragic and contentious litigation arises out of the defendant's education of Kyle, a child who suffered from Cerebral Palsy.  After the due process hearing concluded, and while this appeal was pending, Kyle passed away, in July 2007, at the age of fifteen (doc. 45).[3]   Debra Wilson, the plaintiff, is Kyle's mother and administratrix of his estate. Doc. 48, HR 1404.[4]

Upon conclusion of the due process hearing and the decision of the hearing officer, the plaintiff filed this action for attorneys' fees and costs as the prevailing party relative to that decision.   Complaint (doc. 1).   The defendant filed a counterclaim (doc. 9 at 11 see also doc. 35) appealing the findings and orders rendered by the hearing officer.  It is that counterclaim and its contentions which are currently before the court.  The plaintiff thereafter filed an amended complaint and a second amended complaint seeking additional relief under the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and 42 U.S.C. § 1983 (docs. 15 and 33).  The plaintiff then filed an additional amended complaint after Kyle's death to clarify the proper party to this action was Debra Wilson, as administratrix of Kyle Wilson's estate (doc. 60).

---

[3]This litigation was originally brought by Kyle Wilson, by and through his parents.  The complaint has since been appropriately amended to allow his mother to proceed on behalf of his estate.  Therefore, references to "the plaintiff" refer to Debra Wilson, as administratrix of Kyle's estate.

[4]Citations to the administrative record are noted as "HR."

## FACTUAL BACKGROUND

From the evidence and testimony contained in the administrative record the court finds as follows:

Kyle attended Hatton Elementary in first grade, Leighton for second grade, and was then out of school for about a year, from March 2002 until the beginning of the 2003-2004 school year, when he returned to Hatton.  HR 1409-1411.  The parties do not dispute that both of these elementary schools are within the defendant school system.

The evidence from the hearing falls into several broad areas of dispute, as set forth below:

*Mental Retardation*

Vicki Turberville is the special education coordinator for the defendant school system.  HR 107.  She has never evaluated Kyle.  HR 115.  When asked if the defendant has ever provided Kyle with a formal test relative to cognitive ability, Turberville responded that the district agreed to an independent educational evaluation ("IEE") from Dr. Ellen Spence in 2003, but had yet to see the report.[5]  HR

---

[5]The report from the evaluation of Dr. Spence is undated, but does state that the last date of evaluation was July 7, 2004.  *See* Exhibit T to defendant submissions.  That evaluation is not included in the exhibits from the administrative hearing submitted to this court and Dr. Spence did not testify.  One witness testified that she had not actually seen the report, but knew of the conclusion that Kyle had a low IQ because that was what defense counsel told her.  The report was submitted to this court as Exhibit T to defendant's submissions.

116.  Turberville agreed that a three year evaluation should have been completed for

Kyle in 2001, but there was no reevaluation meeting until April 2003.  HR 124-129.

She does not know if Kyle can read or spell simple words.  HR 129-130, 132.  All of

the information she has regarding Kyle has come from Julie Box and Valerie Acklin.[6]

HR 267-268.  No academic achievement testing was ever done on him. HR 132, 167.

She does not know if Kyle is mentally retarded because "[t]hat has not been an area

of disability that we looked at." HR 152.  However, she states that the teachers were

doing "informal assessments."  HR 169.

　　　Box testified she has not conducted any formal evaluations of Kyle.  HR 695.

Nicole Bowen, a speech language pathologist,[7] unequivocally testified that Kyle was

mentally retarded based on Dr. Spence's evaluation.   HR 2074-2076.    Bowen

believed that Kyle's receptive language skills were at a preschool level, below the age

of five, based solely on her observations.  HR 2046, 2079, 2107.  Bowen did not think

Kyle retained tasks they worked on at school, but never recommended that extended

year services be provided in this area.  HR 2098, 2168-2169.  She further testified he

could comprehend a story at the second grade level and take tests on second grade

---

[6]Julie Box is the special education teacher for Kyle.  HR 693, 696.  Valerie Acklin was
employed as an aide with defendant.  HR 1218.  She worked with Kyle beginning in the fall of
2003.  HR 1220, 1222.

[7]Nicole Bowen is employed by the defendant as a speech language pathologist.  HR 2018.
She first worked with Kyle in the 2003-2004 school year.  HR 2028.

material, but stated this was different from her belief that his receptive language skills were at a preschool level.  HR 2126.  She agreed that a preschooler could not add numbers, but was unaware of reports that Kyle could do so.  HR 2137.

According to the plaintiff, Kyle was very intelligent.  HR 1436.  She states he becomes bored with much of what the school was having him do.  HR 1436-1438.  She  pointed this out to Box, who told the plaintiff she did not believe Kyle had mastered the skills in question yet.  HR 1440.

The plaintiff had an independent evaluation of Kyle performed by Dr. Rowe on February 9, 2005, at UAB.[8]  HR 1545, 1551-1553.  Dr. Rowe opined that Kyle was far more capable of performing activities than what he was being given the opportunity to do.  HR 1567, 1624.  Dr. Rowe noted that although Kyle was nonverbal, he had good receptive language skills, meaning he could understand what was said to him.  HR 1571-1572.  She noted that he used a computer at home, with a mouse, and some key strike.  HR 1616.  She recommended a computer and software appropriate for Kyle's educational needs.  HR 1616-1617.

Dr. Rowe testified that Kyle needed a communication device with voice output, and that the failure to provide this device was hindering his ability to learn.  HR

---

[8]Dr. Rowe is an associate professor at the University of Alabama at Birmingham in the Department of Occupational Therapy.  HR 1534-1535.  She has performed occupational therapy and independent evaluations for various schools.  HR 1538.  She has experience with children who have Cerebral Palsy.  HR 1538-1539.

1574-1575, 1612.  She noted Kyle did a fairly good job of nonverbal communication.
HR 1576.  She stated a communication device was "extremely appropriate and very
needed."  HR 1577.  Dr. Rowe also explained that without the ability to communicate,
Kyle could not make himself understood.  HR 1578.

Defendant's questions of Dr. Rowe clearly suggest that defendant has taken the
position Kyle lacks the intelligence to be educated.[9]  HR  1628-1682.  For example,
defendant suggested Dr. Rowe's testing of Kyle produced little valuable information
(HR 1632); questioned whether Kyle could actually operate the Vanguard (HR 1638);
asked "how on earth does a communication device allow Kyle – we don't know his
IQ.  We don't know his cognitive ability.  We don't know whether he thinks for
himself or not...."  HR 1665; stated "You agree with me, don't you, that he's going
to have to have the capability of thinking out the answer before he knows what
mechanically (sic) button to push?"  HR 1666; asked "if we have limited
intelligence..." HR 1667; stated "You agree with me, don't you, that in order for any
of these things to be of benefit to Kyle, Kyle has to have an intelligent level to

_____

[9]Dr. Rowe also noted that her time with Kyle was limited because she "was not permitted
to come to the school, which is what I usually like to do in these type situations is go to the
child's environment.  But I was not permitted to do that."  HR 1690.  She stated that she believed
it was the school who declined to allow her to come there.  HR 1691.

assimilate the knowledge to allow that to be a benefit to him?" and "we don't know clinically whether he has that level of intelligence, do we, clinically?"  HR 1682.

Similarly, the defendant inquired of Barbara Burgess,[10] "You're assuming that he can formulate an expression and project that to a person to understand his thought. You are assuming that, aren't you?"  HR 1941.

Dr. Waddell, the director of special education prior to Turberville, personally never tried to teach Kyle. HR 2310.  In her opinion, Kyle would never be able to assimilate sufficient knowledge to one day have a job.  HR 2316.  She further opined he was not capable of learning academics.  HR 2317.  She noted that according to Dr. Spence's report, which she had not seen, Kyle was mentally retarded, with an IQ of about 40.  HR 2319-2320, 2337.  She believed that with someone with such a low IQ, an appropriate curriculum would be self-care, rather than an emphasis on learning to read or do simple math.  HR 2321.

The plaintiff heard Box told Valerie Acklin, a nurse and Kyle's aide, that she would have to teach Kyle because Box did not have time to do so.[11]  HR 1233, 1349,

_____

[10]Barbara Burgess is a speech language pathologist.  HR 1751.  She concentrates her work in child language and augmentative communication technology.  HR 1751.

[11]Between the first and second days of testimony (more than 2 months apart) Acklin was relieved of her position as Kyle's aide because the defendant states she was coming in late and leaving early.  HR 370-373.  In essence, she was keeping the same hours as Kyle.  HR 471, 477-482.  The principal prior to Windsor had approved this. HR 486, 491, 1222, 1296.  She went to a meeting with Hudson, Windsor and Turberville, and was told she had until November 25, 2004, to make arrangements so she could work the full time she was supposed to.  HR 1378-1379,

1525.  However, Acklin received no training on how to teach.[12]  HR. 1227-1229,

1288-1289.  Box claims she never told Acklin to teach something to Kyle that Box

had not already taught him.  HR 957.  Valerie Green, Kyle's general education fifth

grade teacher, testified that if Acklin claims to have done 90% of Kyle's teaching,

that would not be true.  HR 1172, 1203.  Acklin was critical of the education Kyle

was receiving.  HR 494-496.  The plaintiff testified that when she has been at the

school, 90% of the time Kyle was in Green's class with his aide.  HR 1519.  She

never saw Green working with Kyle.  HR 1519.

   According to Box, she spent 20 to 40 minutes a day one on one with Kyle and

depended on the aide to reinforce what she presented.  HR 770-772, 780.  According

---

2217-2219.  Rather, she was told she had to work the full hours, and she said she could not.  HR
497, 1295.  She left and Windsor called Billy Hudson, the superintendent, to find out what to do.
HR 515.  According to Hudson, he was already present at this time.  HR 2217-2219.  Hudson
told Windsor to call Acklin and see if she would come back to work the next day.  HR 515.  She
did not return.  HR 516.  Hudson testified Acklin was insubordinate so he decided to get rid of
her.  HR 575.  He later testified that no one at the school system heard from Acklin after she
walked out that day.  HR 2220.  Hudson is positive he learned Acklin was leaving early from
Turberville.  HR 579-580, 2212.

   According to Acklin, she was actually called in to the office after the first meeting with
Windsor, by Hudson.  HR 1303.  Hudson yelled at her for talking to the plaintiff, then told her
she had to stay until 3:15 everyday.  HR 1304.  Acklin stated she left because she could not work
until 3:15 every day.  HR 1314.  The following day, November 4, 2004, she had a sub to cover
her shift.  HR 1315, 1379-1380.  The day after that, she got a letter in the mail stating she was
fired.  HR 1314-1317.  Windsor specifically stated Acklin was not fired.  HR 496-497.  Hudson
stated Acklin walked out and never returned.  HR 2220. He testified that she terminated herself,
and that the defendant did not terminate her.  HR 2236.

   [12]Green and Box used Acklin to make copies for them as needed, usually two to three
times a week.  HR 1332-1335.  Acklin took Kyle with her each time to the copy machine,
because he would cry if she left him behind.  HR 1332.

to Acklin, Box did not spend this much time with Kyle across a week, but may have spent 20 minutes with him per month.  HR 1236-1237, 1251, 1255; 1341.  Box later explained that she introduced the concept for activities, then left it to the aide to "collect data on his performance on this task."  HR 845, 981.  The plaintiff testified that while Box's testimony concerning the activities Kyle was doing at school was accurate, Box was not the one doing those things with him.  HR 1526.  Later, Box testified that she did not spend one on one time with Kyle the current year because the district had moved to more inclusive education, so that Kyle spent the majority of his day in the general fifth grade classroom.  HR 2252-2253.  Box blamed Kyle's lack of progress on the fact the he was either absent or tardy quite often.  HR 2258-2262.  However, she had no documentation that Kyle regressed due to his absences or any written information that the plaintiff had been informed of this concern.  HR 2270.  Box testified that in the last two months, Kyle seemed to have difficulty staying awake as the day went on and greater difficulty holding his head up.  HR 2270-2271.  She noted that just recently, he had been exhibiting physical discomfort and was not feeling well.  HR 2275.

According to Acklin, Kyle was able to learn things fairly quickly and liked being around other children.  HR 1230, 1251, 1256.  Acklin testified that on many days, Box did not work with Kyle at all.  HR 1232.  Acklin also stated that she made

9

the decision regarding what books Kyle would have read.  HR 1234.  She also thought Kyle became bored doing the same activity over and over again.  HR 1251-1252, 1278.

Valerie Green was Kyle's general education fifth grade teacher.  HR 1092, 1203.  She has no special training for working with Cerebral Palsy students and has not worked with a CP student in the past.  HR 1093, 1135, 1202.  In her opinion, Kyle is not mentally retarded.  HR 1095, 1110.  Bowen stated that Green was mistaken because she does not have in depth knowledge of language skills.  HR 2108.  Green testified that Kyle does have disabilities that keep him from learning.  HR 1110.  She stated she assigned him mainly 1st and 2nd grade books because his attention span is too short for anything longer.  HR 1119, 1122.  Acklin was told to pick easy reading, short books, but the different levels of books were not explained to her.  HR 1253.  She just randomly selected what books she thought Kyle would like.  HR 1253-1254.  Acklin thought Kyle had a good attention span.  HR 1269.  She stated if he was interested in a topic, he could do work at his current grade level.  HR 1270.  Acklin also testified that during PE, Kyle just sat and watched.  HR 1255, 1280.

*IEPs*

Kyle's Individualized Education Program ("IEP") at the time of the hearing reflected he could count to 20.  HR 222.  Given the lack of formal assessment or any

data, there were no means of measuring progress in the IEP's.  HR 223-224.  The prior IEP, from the 2003-2004 school year, was amended in August 2003 and noted Kyle used an augmentative communication board.  HR 2139-2140.

Box testified that Kyle had not demonstrated he could tell time, but agreed he had nothing programmed for him to do this.  HR 728.  The same was true for days and months.  HR 729.  Box testified no daily living, personal care goals, had been established for Kyle because that would not be appropriate for him.  HR 730-731. She also stated that Kyle was not capable of fifth grade work.  HR 914.

Box testified that Kyle communicated by pointing at either an icon, a picture, or a flash card.  HR 705.  Box worked on letter and number identification with Kyle for 30 minutes every morning, with just Kyle and his aide, and again in the afternoon. HR 706, 735-736.  When asked if Kyle had difficulty with phonics, Box replied he had not demonstrated that he could blend letters into words.  HR 711.  She concluded this through his pointing and eye gazes.  HR 712.  Box had no experience working with an assistive technology device that would help Kyle in blending sounds.  HR 713.  However, she stated that she based her conclusion that he could not blend letters on teacher-made probes that list letters and show accuracy for identified correctly and incorrectly.  HR 715.  Box did state that Kyle's reading comprehension was at a 2nd grade level when books were read to him.  HR 754-757.  She agreed that if Kyle

11

could read, he had no means by which to demonstrate that.  HR 760-761.  Box also testified that the defendant had not assessed Kyle for listening comprehension.  HR 766.  She agreed no intellectual assessment or academic achievement test had ever been done.  HR 768.

Turberville  did not know what Kyle did in his classroom on a daily basis and has never observed him there.  HR 221, 269-270.  She stated he was in a regular fifth grade classroom and took modified tests based on the fifth grade curriculum. HR 236.  He also had direct math instruction in the resource room one hour a week, special ed two and a half hours a week, speech therapy 50 minutes a week and occupational therapy.  HR 249-250.

Box stated that she placed Kyle with learning disabled students, although she does not know if he has a learning disability.  HR 698.  She stated he could not read.  HR 698.  She has never taught a student with Cerebral Palsy how to read.  HR 698.  She testified that Kyle had limited abilities and would never go to college, live independently, or have a job.  HR 746-747.  She stated he could not access a computer independently, but just pounded the keyboard or slid the mouse with no accuracy.  HR 750.

Billy Hudson was superintendent for about one and a half years at the time of the hearing.  HR 538.  He had seen Kyle in class, but has no opinion as to whether the

IEP is appropriate and agreed he does not have the expertise to make that decision. HR 541.  He had not asked why plaintiff thought Kyle's education was inappropriate, nor has he asked anyone else to make this inquiry.  HR 546-547.  He knew the IDEA dealt with special education law but suggested that Mr. Munsey, defendant's counsel, Ms. Turberville, and Ms. Harris, the federal progress coordinator would be who understood what the law required.  HR 561-563.  He has done nothing to ensure compliance other than check with Mr. Munsey when something goes wrong to make sure defendant is following the proper procedures. HR 564.  When asked if he has ever taken any specific steps to ensure that Kyle's educational program was appropriate, the following exchange occurred:

> Q.  Have you ever taken any specific steps to assure that Kyle's educational program is appropriate?
> A.  No.  I believe that his educational program has been appropriate.
> Q.  No.  Here's my question – have you ever taken any specific steps?
> A.  The steps we follow by the Alabama course of study --
> Q.  You, personally.
> A.  No, I haven't.  Because – let me add this, because everything is okay with his education.  It's ran (sic) by the Alabama course of study that we follow.
> Q.  What is --
> A.  There was no need to take any steps.

HR 566-567.

Hudson testified he objected to bringing in experts for guidance with regard to Kyle's education as long as defendant was following the course of study and doing

13

what the law is, but he agrees that he does not know enough about the law to know if he is following it.  HR 586.  He does not know what training his staff has in special education.  HR 586.  He testified he relied on Turberville to make sure the program was appropriate for Kyle.  HR 587.  He stated "With special ed being so unique as it is, and there is so many loopholes with the law, you know, it's very easy to mess up in special ed.  So, you know, I think this system is doing all we can do."  He is then asked "Do you know what you are doing?"  To which the witness responded "No, ma'am, other than what Ms. Turberville has been doing."  HR 587-588.

Barbara Burgess, an expert witness who evaluated Kyle, testified that she thought a simple communication device should be bought immediately, meaning that very day.  HR 1864.  Upon being informed at the hearing that the school had not done that, Burgess replied, "It's sad.  I think it's negligent."  HR 1865.  She further testified that there "was no appropriate engineering of the environment for a child with CP like Kyle's."  HR 1939.

Box and Bowen testified that Burgess' report of her observation of Kyle was inaccurate because the day Burgess observed Kyle at school was not a typical day for him.  HR 998, 1013, 1017; 2059.  Bowen then stated that she was not there, so she could not say what was atypical about the day.  HR 2113.  His aide, Barbara Peoples, stated the day Burgess watched was pretty typical of what Kyle did every day.  HR

14

1786.  She was a substitute aide, but had worked with Kyle many times.  HR  998-999, 1013.  Additionally, the general education teacher was not present and there was a substitute in that class as well.  HR 1001-1002.  Box further testified that if Peoples testified Kyle's inclusion with the general education class that day was the same as any other day, that would not be truthful.  HR 1016-1017.   According to Burgess, there was no integration of Kyle into the class at all.  HR 1786.  She never saw his wrist splints used.  HR 1789.   Bowen testified that she was personally offended by Burgess' suggestion that the school did not have the knowledge or expertise to teach Kyle.  HR 2059-2060.

   Bowen states that she thinks Kyle was getting an educational benefit and that she was "very proud of what we're doing."  HR 2048, 2057.  In her opinion, Kyle would never respond above the preschool level.  HR 2048.  Bowen stated Kyle's current IEP was complete and sufficient.  HR 2051.  In her opinion, Kyle was both cognitively and physically impaired.  HR 2056.

   Tom Windsor, the school principal for Hatton Elementary, knew very little about IDEA, had no basis for knowing whether a particular program was appropriate for a disabled child and did not know what any of the defendant's legal responsibilities would be for any disabled child HR 405, 417-421, 443.  Windsor has observed Kyle's regular classroom, and stated there was an aide who sits with him

15

and provides additional attention, but other then that he participated in regular activities.  HR 421-422.  He stated he did not know if the communication board was still being used, but then stated that he knew it was not.  HR 422-423, 432.  He knew Kyle was supposed to wear splints and stated the splints were usually on Kyle, but Windsor did not know the purpose of them. HR 431-432.   As principal for about a year prior to the hearing, Windsor did nothing to ensure Kyle received any evaluations.  HR 517.

Burgess reviewed Kyle's IEP's, the report from Dr. Ellen Spence, and observed him at school. HR 1765-1774, plaintiff's exhibit 3.  Her evaluation was to see how Kyle was functioning, make a professional estimate on his language use, and to see how he communicated and used language in a school setting.  HR 1766.  She found he had the ability to communicate, but the defendant's method for educating Kyle was ineffective. HR 1761-1762, 1770-1775.  Additionally, the defendant failed to teach real life skills and failed to allow Kyle to initiate communication.  HR 1778-1783. Burgess believed Kyle could understand things around him just fine.  HR 1784-1785.

 She criticized Box for repeatedly asking Kyle the same question multiple times when he had already answered it correctly.  HR 1797.  Box stated she did so because Kyle was inconsistent with his answers, which Burgess believed was due to him being asked the same thing over and over.  HR 1797-1798.

Burgess testified that the program for Kyle was not designed to enable him to make reasonable progress.  HR 1802-1803.  Burgess did not think Kyle's IEPs were appropriate, and found no evidence that the defendant had comprehensively evaluated Kyle.  HR 1804.  She stated nothing in the IEPs showed that Kyle was working on any kind of independence and it all centered around him only answering yes/no questions. HR 1803-1804.  When she asked Box whether any objective testing had been done to measure Kyle's receptive language skills, Box replied no, explaining that Kyle could not take a standardized test.  HR 1807.  Burgess testified that nonverbal intelligence standardized tests already existed.  HR 1808.

Burgess stated when she arrived, Kyle was at the copy machine with his aide. HR 1767.  Box then took her to Kyle's regular classroom.  HR 1769.  She watched the aide and Box take Kyle through a letter recognition exercise, which she noted was laborious and difficult for Kyle because of the manner in which it was set up.  HR 1771.  Burgess stated Kyle was able to do this exercise, but there were better ways to accomplish this, such as through a communication board. HR 1772-1773.  Burgess noted with the next exercise, money recognition, he was asked the same thing over and over after giving a correct response.  HR 1774-1775.  Burgess thought Kyle became either frustrated or bored with that exercise, causing him to stop participating. HR 1775-1776.  Burgess suggested that the school should make the exercises

17

functional instead of pointing to things over and over. HR 1777-1780. She did not observe anything to suggest that the defendant paid attention to what motivated Kyle. HR 1778.

Burgess explained that a communication device would provide an outlet, empower, and motivate someone who was not verbal. HR 1783. She stated that learning to use a device would be motivating to someone just so he or she could have an outlet for expression.[13] HR 1783. Burgess testified that to make meaningful education progress, an assistive technology device was necessary and that he had adequate cognitive skills. HR 1783-1785. She noted that he had adequate receptive skills and needed a functional, consistent way to express himself. HR 1833.

Dr. Rowe stated that Kyle's academic abilities were underestimated and that his IEP was not providing him with academic opportunities that matched his cognitive abilities. HR 1579. She also noted that the IEPs were extremely repetitive and not providing for applied functional skills. HR 1605. Dr. Rowe believed the IEPs reflected an assumption that Kyle was cognitively impaired and were designed to occupy him rather than teach him. HR 1610. She noted that he was very capable of thinking for himself. HR 1694.

---

[13]Bowen agreed no goals had been developed to allow Kyle to express himself spontaneously. HR 2112. All of his IEP goals were based on him responding to someone asking him something. HR 2112.

*Kyle's injury*

Kyle missed more than a year of school due to an aide, Bonnie Starkey, tripping while carrying Kyle.[14]  HR 1455, 2294-2295.  In March 2002 while moving Kyle from his wheelchair to a changing table, she stumbled and fell on top of Kyle. HR 198.  They both fell and Kyle's leg broke.  HR 1462-1463.  Kyle was in a body cast for four months.  HR 1463, 2296.  According to plaintiff, Kyle lost functioning he had prior to the accident.  HR  1454-1458, 1462-1464, 1974.  She stated he is worse physically, as he can no longer sit cross legged or stand with a stander.  HR 1988. After his leg healed, his right leg was about five inches shorter than his left leg. HR 1463.  The defendant thereafter requested a physical therapy evaluation, but the plaintiff asked that this not be done because of Kyle's hip condition from the fall.  HR 271, 273-275.

An occupational therapist, Linda Johnson, came to Kyle's house the summer before he returned to school.  HR 1465, 1474.  In August 2003 Kyle returned to Hatton.  HR 1411.

According to Dr. Rowe, the injury caused ongoing problems for Kyle.  HR 1694.  The plaintiff testified that after the March 2002 injury, Kyle did not receive any services from the school until November 2002 when Linda Johnson came to her

---

[14]Bonnie Starkey was one of the LPNs who served as Kyle's aide.  HR 197.

house for education services.  HR 1981-1982.  Dr. Waddell, who was the director of special education at the time, testified that the school was willing to make accommodations for Kyle to attend after this injury, but the plaintiff preferred to keep Kyle at home because of his full body cast.  HR 2297, 2377.  Thus, the defendant sent the assistant to the plaintiff's house every day to work with Kyle.  HR 2297, 2299. According to the plaintiff, the aide came to the house everyday and visited so that the defendant could keep her on payroll.  HR 2378.  At the beginning of the 2002-2003 school year, the school again offered to make accommodations for Kyle to attend school, which the plaintiff declined.  HR 2301.  Therefore Dr. Waddell offered the plaintiff homebound services.  HR 2301.  Dr. Waddell testified that the homebound teacher started with five mornings a week but got permission to reduce it to three. HR 2303-2304.  Thereafter, the plaintiff asked that it be reduced to two days a week. HR 2304.  Dr. Waddell believed his IEP's at the time were appropriate.  HR 2305.

The plaintiff stated that Johnson came for about an hour once or twice a week, but after about two weeks, told the plaintiff that she did not know what she was doing.  HR 1982.  She stated she did not know how to teach Kyle and had never been around a child with disabilities.  HR 1983.  Johnson came to the house for about three months.  HR 1983-1984, 2163.  Additionally, in January or February of 2003, a speech therapist came to her house twice a week for about six or eight weeks.  HR

20

1977, 1979-1980.  Kyle also received some occupational therapy in the summer of 2003.  HR 1985.  Bowen testified she first met with him as her student in July 2003 at Kyle's home.  HR 2139. Kyle was also receiving speech services from Robin Butler in his home.  HR 2028-2029, 2157.  Butler saw him ten times over seven weeks. HR 2176-2177.  They worked on pointing at pictures and letter identification. HR 2177.  Butler testified these exercises were designed as a step toward using an augmentative communication device.  HR 2178.

*The Vanguard and other Communication Devices:*

When Kyle was six and a half, the plaintiff took him to experts in communication devices for children with special needs who, after three months of evaluations,  recommended the Vanguard for Kyle, which the plaintiff purchased. HR 802, 1420-1427, 1711, 1764-1765.  The Vanguard is a communication device which allows hundreds of words and sentences to be programmed into it.  HR 837-838; 1424-1425. The plaintiff was unaware of any obligation the school district had to provide assistive technology.  HR 1421.  Plaintiff asserts defendant did not bother to learn to use it and after several months took it away from Kyle.  HR 1421-1430; 1248-1250.  While Kyle attended Hatton, plaintiff took the communication device to Hatton, but the staff did not let Kyle use it, requiring him to point to objects instead. HR 1234-1236, 1479-1482, 1951, 2098-2100, 2106.

Turberville stated that she did not know why the Vanguard was not at school, and that she had not been notified it was broken.  HR 140.  She further stated that the defendant only had to pay to have it repaired if it was an appropriate device for him.  HR 141-142.  Turberville further related that the only training the teachers had with the Vanguard was that the speech therapist met with a representative from Vanguard, Sandy Baldwin, once.  HR 147-148, 177, 800, 808.

According to Bowen, she and  Robin Butler met with Sandy Baldwin one time at Kyle's house in the summer of 2003.[15]  HR 2029.  Bowen testified that this was due to Butler's observation that Kyle was having difficulty using the Vanguard due to lack of manual dexterity.  HR 2029-2031.  However, Baldwin also expressed concern that Kyle did not provide a reliable yes/no response.  HR 2031.

Butler testified that when she was teaching Kyle in the summer of 2003, the plaintiff showed her the Vanguard and stated that while she understood the basic operation, she did not know how to use it to its full potential and would like to learn to use it better.  HR 2184.  Therefore, Butler contacted Sandy Baldwin, a customer service representative from the Prentke Romich Corporation, to teach the plaintiff

---

[15]Robin Butler is employed by defendant as a speech language pathologist.  HR 2170-2171.  She had previously worked with children with the severity of disability that Kyle had, but not with Cerebral Palsy of the severity that Kyle had.  HR 2176.

how to use the Vanguard better.[16]  HR 2184.  The Vanguard was functioning at the time, but not in a way that would be most conducive for Kyle to communicate.  HR 2185, 2195. Baldwin tried to rectify this.  HR 2195.  Because of the observation that Kyle had trouble making his hands press the buttons,  Baldwin recommended a head pointer to make it easier for Kyle to access the board.  HR 2186, 2188.  She had brought one with her, but it was broken.  HR 2199-2200.  According to Butler, when she stopped working with Kyle, the goal was to find a means for Kyle to access the Vanguard.  HR 2200-2201.  Butler did not work with Kyle after the summer of 2003.  HR 2188.  She did not believe he made any progress during the summer.  HR 2189.

Box testified that she met with Baldwin, but believed Baldwin had evaluated Kyle, even though she had not.  HR 801, 864.  When Box met with Baldwin, she understood that Kyle could not access the Vanguard independently because he could not push the buttons in a meaningful way.  HR 805-806.  Therefore, Baldwin recommended using eye gaze and building skills to use a head pointer.  HR 807.

Box asserted she had never seen the Vanguard nor seen Kyle with the Vanguard.  HR 801.  She testified that it had never been brought to school, that she heard it was broken, and that she had never seen Kyle use it.  HR 720, 804-805.  The plaintiff testified that she showed Box how to use the Vanguard when Kyle started

---

[16]This is the same meeting that Bowen attended.  HR 2193.

the 2003-2004 school year.  HR 1480.  She testified Box came to her house and used in there.  HR 1483.  The plaintiff then learned it was not being used at school.   HR 1481.

Bowen stated that when she was working with Kyle, she wanted him to have a reliable way to answer yes/no questions.[17]  HR 2038.  She learned from a conference that Kyle could use his hands to indicate yes/no.  HR 2039-2040.  However, she agreed it was laborious for Kyle to use his hands to point.  HR 2112.  In her opinion, the most appropriate form for Kyle to communicate was to use eye gaze.  HR 2052.  Box agreed Kyle was fairly accurate in the use of his hands to indicate.  HR 908.

According to Acklin, the Vanguard was in the speech room for the 2003-2004 school year, either in a closet or on the counter.  HR 1235, 1248-1249.  She did not know if it was broken because they did not use it.[18]  HR 1235.  Acklin testified that it was in the closet in Box's room for a day, then brought to the speech room.  HR 1249-1250; 1355-1356.  Acklin also stated that Nicole Bowen did nothing with the Vanguard.  HR 1384-1385.  Bowen admitted during the hearing that she had no experience with a Vanguard and did not know how it worked.  HR 2149.  The

---

[17]Bowen did not know how long Kyle had been answering yes/no questions, whether he could accurately identify letters of the alphabet, whether he could identify numbers, or whether he could add, but was of the opinion he could not comprehend a story at a fourth grade level.  HR 2126.

[18]According to the plaintiff, the Vanguard was used in speech class for a brief time.  HR 1704.

plaintiff figured out it was not being used at school and brought it home.  HR 1482.

During the hearing, the plaintiff testified that it was currently broken and she did not

have the money to repair it.  HR 1711.

Kyle's subsequent IEP was based on teaching skills for using the head pointer,

instead of pointing with his hands, based on a consultation with a vendor of

augmentative communication devices who observed Kyle for about ten minutes with

the Vanguard.[19]  HR 808-810, 2140-2141.  However, a flashlight being used to

simulate a head pointer frustrated Kyle.  HR 143, 190, 809-810, 906-908, 2052-2053.

Part of the problem was his lack of ability to hold his head up.  HR 907.  Bowen

concluded Kyle lacked the head control to use such a device.  HR 2055, 2161.  She

stated after the head pointer was recommended, no new IEP was done because of the

litigation, even though Bowen thought one should be done.  HR 2142.  Bowen

admitted she had never taught any student to use a head pointer.  HR 2148, 2150.

Defendant wanted Kyle to communicate by pointing, which he could not do

because of Cerebral Palsy.  Kyle had splints to help him with pointing or reaching,

which the defendant also failed to use properly, if at all.  HR 1594-1597; 2113-2118.

According to Ms. Green, Kyle's aide would put the splints on, and he would wear

them for about an hour at a time.  HR 1097-1099.  Bowen testified sometimes Kyle

---

[19]His educational team, including Bowen and Box, determined the Vanguard was not an
appropriate device for Kyle.  HR 2101-2102, 2104.

had on the splints when she worked with him, and sometimes he did not, but she was not familiar with his splint schedule. HR 2117-2118.

On October 21, 2003, Box consulted with Technology Assistance for Special Consumers ("TASC") about Kyle's need for assisted technology, but the consultant, Lisa Snider, never evaluated or observed Kyle. HR 863. Box told Snider that Kyle was not able to use the Vanguard, even though she had never seen Kyle with it. HR 864-865. When Bowen and Box went to TASC, someone from there suggested the Step-by-Step even though no one from TASC had ever observed Kyle directly.[20] HR 2041, 2144. The defendant purchased two in November 2003.[21] HR 149, 812, 2042.

Bowen testified that the Step-by-Step cannot express wants and needs but is really just for social interaction, to work on social timing of conversation. HR 2042. Bowen initiated the use of the Step-by-Step in November 2003 so that they had something to build on because the Vanguard was not being sent to school. HR 2041. Bowen also stated that she saw Kyle use the Vanguard prior to the time she was his teacher, but since then the Vanguard has never been operational. HR 2099.

---

[20]Bowen testified she first met with someone from TASC, in Kyle's home in the summer of 2003. HR 2140. The court finds this was likely the consultation that Robin Butler arranged with Sandy Baldwin to provide the plaintiff with instruction on the Vanguard. A TASC consultation occurred in October 2003 with someone who had never seen Kyle. HR 2139, 2144.

[21]The Vanguard allows hundreds of words and sentences to be programmed into it. HR 837-838. The Step-by-Step does too, but not nearly as many as the Vanguard, and was programmed only with social statements. HR 164, 171, 179-181, 721-723, 812, 871-872, 928.

However, she also agreed that it was operational in July 2003. HR 2100. Bowen also testified that she never saw Kyle use the Vanguard because he could not. HR 2104. She stated the only time she saw him attempt to use it was prior to the time he was her student. HR 2105. She then stated she watched him attempt to use it before he was her student "hours and hours." HR 2105-2106. She further testified that she saw him attempt to use it in his home in the summer of 2003 and he could not do it. HR 2160-2161. Bowen could not state any reason why no IEP stated there was difficulty with Kyle using the Vanguard. HR 2106. She further agreed that although TASC recommended reintroduction of the Vanguard, this was never done. HR 2144-2145. Bowen further agreed that she had done nothing to have Kyle evaluated for an assistive technology device. HR 2119, 2147. She agreed that such a device was appropriate if Kyle had a way to access it. HR 2119.

Based on the information Box provided, TASC recommended Kyle should use the Step-by-Step until the Vanguard could be reintroduced. HR 865; plaintiff's exhibit 2. The Vanguard was never reintroduced. HR 865. Box asserted this was because Kyle never demonstrated the abilities necessary to use the Vanguard. HR 903. However, she was unaware of documentation that he was using the Vanguard in school in 2001. HR 1037-1038. She further stated that his motor skills had deteriorated since she first started working with Kyle. HR 903, 994, 1052. In Box's

27

opinion, Kyle was too limited to use any assistive technology device at the time of the hearing.  HR 1073.  Box agreed that Kyle had no means by which to demonstrate whether he knew what a sentence means.  HR 783-784.  Turberville also testified that the TASC report showed that a teacher said the Vanguard was too advanced for Kyle and agreed that no one from TASC ever observed Kyle.  HR 144, 272.

No assistive technology evaluation, to allow Kyle to communicate, was performed by the defendant prior to June 2003. HR 167.  As of the time of the hearing, the defendant was no longer using the Step-by-Step because Kyle did not respond to it that year.  HR 188, 860.   The plaintiff stated that Kyle viewed it as a toy.  HR 1486-1487.  She thought it was not challenging enough for him.  HR 1487.

Turberville did not ask that use of the Step-by-Step be reevaluated and does not know if anyone else did either.  HR 188.  She agreed Kyle was given no opportunity to communicate, even though the defendant had no evidence or evaluation that he could not communicate with appropriate technology.  HR 189.  The TASC report concluded that the Vanguard should be reintroduced but the Step-by-Step should not be taken away, which the district ignored.  HR 192; 866-867.  According to Box, the Step-by-Step was used "off and on."  HR 723.  She agreed it had not been used at all his fifth grade year, but stated "he absolutely loved it."  HR 724-725.  Bowen asserted that it was not used because Kyle "never got hooked on it."  HR 2146.

*Wheelchair and Hand Splints*

Turberville did know Kyle had the strength in his hand to use his wheelchair, but did not know if he could use a writing device. HR 143-144.

Plaintiff asserts Kyle could drive his own electric wheelchair, with assistance.[22] HR. 1412-1413.  Box testified he could not drive it independently at all.  HR 726-727, 740, 946.  However, she further explained that when she saw Kyle being brought to school, his mother operated the wheelchair and he could not operate it himself in school because that would be a "safety issue."  HR 918, 1042-1043.  Green also believed that Kyle would hurt himself or another child if allowed to use his wheelchair by himself, but she never saw him operate it himself.  HR 1101. However, Bowen knew Kyle could use the wheelchair independently and stated that she had seen him do so many times in wide open spaces where safety was not an issue.  HR 2095-2096.  Bowen also agreed that there was no plan in place to teach Kyle how to use his wheelchair.  HR 2120.

Box was unaware of documentation that he was using the wheelchair with only occasional assistance in 2001.  HR 1040-1042.  Box later testified that the power for

---

[22]Plaintiff claims defendant turned off the chair's motor rather than teach him to drive himself as a "self-help" skill.  Plaintiff's response at 12, citing HR 1413-1420, 2120, 2095-2096, 1033-1034.  Box testified she did turn the power on it off sometimes, for Kyle's own safety.  HR 741, 947. She testified that if it was left on, Kyle would push the joystick, and be "out of control."  HR 947.

the wheelchair was only off when Kyle had a substitute aide, so the aide did not accidentally run Kyle into a door or wall or another child.  HR 1042.  Green testified that the wheelchair is always turned off when in her class.  HR 1102.  Box stated Kyle did not have any program to assist with mobility skills relative to the wheelchair.  HR 1042-1043.

Acklin stated Kyle could easily move his wheelchair himself, because she saw him do so and worked with him on this.  HR 1266-1267; 1338-1340.  She did state if it was put on the fastest speed, he would do "doughnuts" with it.  HR 1267.  Acklin also testified that both Green and Box saw him doing this.  HR 1340.   The plaintiff testified that Kyle could drive his own wheelchair, if it was kept on low, and did so at home.  HR 1413, 1417-1418.  However, she pointed out that it took longer for Kyle to use the wheelchair himself then have it operated by someone else.  HR 1416.  When she asked why the district was not working with Kyle to have him move himself, the plaintiff was told it was because it was time consuming, or for safety reasons.  HR 1417.

Box testified that she was not qualified to make an assessment regarding whether Kyle had outgrown his wheelchair.  HR 996.  Green agrees that Kyle looked

too big for the wheelchair, but believed it would be plaintiff's responsibility to have Kyle reevaluated for this.[23]  HR 1205.

Plaintiff faults Box for not recommending that Kyle's physical condition be reevaluated and faults the defendant for not ensuring that Kyle's wheelchair properly fit him.  HR 994-997, 1052, 1491.  Bowen believed Kyle physically regressed.  HR 2135-2136.  The plaintiff testified that he had not regressed, but his wheelchair was too small.  HR 1490. The defendant has never provided the plaintiff any assistance with ordering or making sure the wheelchair fit Kyle properly.  HR 1491.

Dr. Rowe noted that Kyle was medically fragile and had indications of pain when he was moved in certain ways.  HR 1555.  She was told by the plaintiff that was why physical therapy had to be stopped.  HR 1555-1556.  Dr. Rowe believed a physical therapy evaluation was needed.  HR 1557.  She testified that Kyle drove his wheelchair down the hall at her office independently.  HR 1559-1560.  She saw no reason for a safety concern in Kyle's operation of his wheelchair.  HR 1560-1561.  Dr. Rowe testified that teaching mobility through the use of the wheelchair is important, because it gives an individual independence, as well as decreases the burden to others.  HR 1562.

---

[23]During the hearing, there was testimony that Kyle was getting measured for a new wheelchair, but Medicaid refused to pay for it because Medicaid will only pay for a wheelchair every five years.  HR 1490-1491, 1702-1704.  The defendant clearly believed it was not the school system's responsibility to provide a properly fitting wheelchair for Kyle.

Dr. Rowe further stated that, in her opinion, Kyle should wear his hand splints from the time he wakes up until he goes to sleep because it allows him to have thumb/finger opposition to manipulate objects.  HR 1563-1564.  She further believed Kyle needed to be given the opportunity to engage in everyday activities such as drinking from a cup, to increase his functional skills.  HR 1564-1565.

Turberville states that she heard from the Occupational Therapist that Kyle should have hand splints, but his mother rejected that.   HR 283, 285.   This conversation was in relation to a request for an independent education evaluation from plaintiff's mother, which defendant denied.  HR 286-287.   Box testified Kyle could not wear the splints all the time because they caused pressure points on his hands.  HR 700.

## STANDARD OF REVIEW

This case is before the court on the administrative record of the due process hearing.  The IDEA directs the district court to base its decision on a preponderance of the evidence and to "grant such relief as the court determines is appropriate." *Draper v. Atlanta Independent School System,* 518 F.3d 1275, 2008 WL 603280, 2 (11th Cir.2008), citing 20 U.S.C. § 1415(i)(2)(C)(iii).  A district court must conduct an entirely de novo review of the ALJ's findings and has discretion to determine the level of deference it will give to the ALJ's findings.  *CP v. Leon County School Bd.*

*Florida*  483 F.3d 1151, 1156 n. 4 (11th Cir.2007); *School Bd. of Collier County v.*

*K.C.*, 285 F.3d 977, 982-83 (11th  Cir.2002).  Nothing prevents a district judge from

factfinding in IDEA cases.  *M.T.V. v. Dekalb County Sch. Dist.*, 446 F.3d 1153, 1156

(11th  Cir.2006). Thus, there is no rule in the IDEA context that an ALJ's credibility

findings must be accepted unless the reviewing judge personally rehears live

testimony of the witness.  *School Bd. of Lee County v. E.S..*  2008 WL 687259, 4

(M.D.Fla.2008).

Nonetheless, "the administrative decision in an IDEA case is entitled to due

weight and the court must be careful not to substitute its judgment for that of the state

educational authorities. Still, ... the extent of the deference to be given to the

administrative decision is left to the sound discretion of the district court which must

consider the administrative findings but is free to accept or reject them." *School Bd.*

*of Lee County, Florida v. M.M.,*  2007 WL 983274, 2(M.D.Fla.2007); citing *Bennett*,

203 F.3d 1293, 1297-98 (11th Cir.2000). *See also M.M. ex rel. C.M. v. School Bd. of*

*Miami-Dade County, Fla.,* 437 F.3d 1085, 1097 (11th Cir.2006). "To that end,

administrative factfindings are considered to be prima facie correct, and if a

reviewing court fails to adhere to them, it is obliged to explain why." *School Bd. of*

*Lee County, Florida v. M.M.,*  2007 WL 983274, 2(M.D.Fla.2007); citing *M.M.*, 437

F.3d at 1097 (quoting *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1314 n. 5 (11th Cir.2003).

Hence, the court must conduct a de novo review of the hearing officer's findings. *Weiss v. School Board of Hillsborough County*, 141 F.3d 990, 991 (11th Cir.1998). However, the court is not limited to the evidence in the administrative record. *Doe v. Alabama State Department of Education*, 915 F.2d 615, 657 n. 3 (11th Cir.1990). While the court may consider additional evidence, the determination of what is 'additional' evidence must be left to the discretion of the trial court, which must be careful not to allow such evidence to change the character of the hearing from one of *review* to a *trial de novo. School Bd. of Collier County, Fla. v. K.C.,* 285 F.3d 977, 981 (11th Cir.2002), citing *Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1298 (11th Cir.2000) (quoting *Town of Burlington v. Depot of Educ.*, 736 F.2d 773, 791 (1st Cir.1984)) (emphasis added). "The extent of the deference to be given to the administrative decision is left to the sound discretion of the district court which must consider the administrative findings but is free to accept or reject them." *Walker Co.*, 203 F.3d at 1297-98; see also *Doe v. Alabama State Depot of Educ.*, 915 F.2d at 657 n. 3 (same).

Because the defendant is the party challenging the administrative decision, it bears the burden of proof before this court. *See Clyde K v. Payslip School District,*

34

*No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994); *Angevine v. Smith*, 959 F.2d 292, 295 (D.C.Cir.1992).

## LEGAL ANALYSIS

The IDEA guarantees disabled students a free appropriate public education ("FAPE").  *See e.g. School Board of Collier County v. K.C.*, 285 F.3d 977, 979 (11th Cir.2002).  To do so, a school must formulate an IEP during a meeting between the student's parents and school officials.  20 U.S.C. § 1414(d)(1)(A)-(B).  Courts must ascertain whether (1) the school complied with the IDEA's procedures; and (2) the IEP developed through those procedures is reasonably calculated to enable the student to receive educational benefits.  *Loren F. v.  Atlanta Independent School System*, 349 F.3d 1309, 1312 (11th Cir.2003).  A FAPE described in an IEP need not be the best possible education, but only one that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction.  *Loren F.* 349 F.3d at 1312.

The court has reviewed the entire administrative record, the exhibits submitted, the briefs of the parties, and the decision of the hearing officer.  With that background, the court considered each of the 14 issues the defendant raises in regard to the administrative decision:

**1.  Whether plaintiff properly and correctly filed request for due process hearing:**

A parent has a right to a due process hearing if the parent believes their rights or the rights of their child have been violated or if they disagree with the child's special education services.  AAC 290-8-9-.8(8);[24] 34 CFR § 300.507; 20 U.S.C. § 1415. 20 USC § 1415 (b)(7)(B)(ii) and (iii) require a  "description of the nature of the problems of the child..." and a "proposed resolution of the problem to the extent known and available..."  *See also* AAC 290-8-9-.8(c)(1)(ii) (stating a hearing request must include a description of the nature of the problem).

Defendant argues the complaint for the due process hearing was deficient.  However, the same AAC section which grants the right to a due process hearing also states the state educational agency may not delay or deny a parent's right to a due process hearing for failure to provide the notice required.   AAC 290-8-9-.8(8)(c)(1)(iv).  A hearing request was filed March 19, 2003, by attorney for plaintiff.  *See* exhibit A to defendant's brief, hearing exhibit 1.  Defendant argues it read like a tort action for injuries sustained by Kyle.  Defendant's brief at 3.  Further, the defendant asserts the hearing officer should have conducted a pre-hearing conference

---

[24]The Alabama Administrative Code is referred to as "AAC."  The court has used the regulations in effect as of the date the hearing officer entered his decision.  The Alabama Administrative Code has since been amended, thus the sections cited by the court do not necessarily match the relevant section numbers as are currently in effect.

to refine or state the issues, violating his duty render a statement of issues and purpose of the hearing. *See* AAC 290-8-9-.08(c)8.(ii)(VI). Additionally, defendant argues, the record did not reflect a listing of issues to be decided.

The plaintiff asserts that the notice does not have to set everything out in painstaking detail. Plaintiff's response at 60, citing *Escambia Co. Brd of Ed v. Benton*, 406 F.Supp.2d 1248 (S.D.Ala.2005). Additionally, the parties mediated their claims before the hearing, providing the defendant further notice of the issues. Plaintiff's response at 62. The plaintiff further argues that the defendant never raised the issue of adequacy of the hearing notice until now. Plaintiff's response at 63. *See Escambia*, 406 F.Supp.2d at 1256. The court finds the *Escambia County* case quite similar to the defendant's argument here. In that case, the Court noted that, in the only published federal decision citing § 1415(b)(7)(A)(ii), the Supreme Court observed that Congress has legislated IDEA due process hearing procedures by "impos[ing] minimal pleading standards." *Escambia County,* 406 F.Supp.2d at 1260, citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 532, 163 L.Ed.2d 387 (2005); *Sammons v. Polk County School Bd.*, 2005 WL 2850076, *4 (M.D.Fla.2005).

In an April 9, 2003, letter, the hearing officer confirmed a telephone conference with the parties in which they delineated the issues. Exhibit B to defendant's

submissions.  The defendant did not object at that time to the notice.  The hearing officer's decision reflects that pre-hearing conferences were held April 9, 2003, August 23, 2003, November 13, 2003, and November 2, 2004.  Hearing officer decision at 1.

The court has reviewed the plaintiff's original request for an Impartial Due Process hearing.  The court agrees that the request is not the clearest statement of issues possible.  However, the defendant had the benefit of no less than four pretrial conferences, a  mediation, and a delay of over a year from the time the request was filed until the start of the due process hearing.  The court does not believe that the due process notice, in light of the surrounding circumstances, was so deficient as to require that the entire due process hearing be set aside.  The court further finds that Alabama Administrative Code, which states that a hearing officer "may not deny or delay a parent's right to a due process hearing for failure to provide the notice required in Ala. Admin. Code r. 290-8-9-.8(8)(c)1.(ii)" dispositive of this issue.  AAC 290-8-9-.8(8)(c)1.(iv).  The propriety of the original due process notice filed by the plaintiff does not provide any basis to set aside the decision of the hearing officer.

**2.  Whether the hearing officer correctly applied the law relative to transition issues for a child under 14.**

Kyle was 12 when the 2004-2005 IEP was done.  The hearing officer ordered the IEP team[25] to meet within 30 days of the May 13, 2005, Order and consider transition services for Kyle.  Hearing officer decision at 64.  The defendant asserts that the law requires transition services regarding the child's course of study from age 14 forward (defendant's brief at 7).  Defendant relies on AAC 290-8-9-.5(2)(h) and 290-8-9-.5(3)(h) for its argument.

Transition services are a coordinated set of activities for students with disabilities designed to prepare the student for life after school.  *See* 34 CFR § 300.43,[26] 20 U.S.C. § 1401(34).  Federal regulations specify that an IEP must include a statement of the needed transition services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, a statement of the interagency responsibilities or linkages (or both) before the student leaves the school setting. 34 CFR § 222.50 (1)(iv).  *See also* 34 CFR § 300.320 (previously 34 CFR §

---

[25]The IEP team consisted of a speech language therapist, Julie Box, the plaintiff, Kyle's fifth grade general education teacher and the special education coordinator, Vicki Turberville. HR 893.  The principal routinely attended IEP meetings, but did not for the latest IEP for Kyle. HR 893.

[26]Due to amendments, this section was 34 CFR § 300.29 at the time of the hearing. While it has been renumbered, the material content of the section has not changed.

300.347)( stating transition services must begin "not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team").

The plaintiff asserts that 34 CFR § 300.347 (now 34 CFR § 300.320) requires the IEP to include a statement of transition services a student will need beginning at age 14, or younger if appropriate.[27]  Plaintiff's response at 56-57.  Plaintiff states this finding should be upheld because it was appropriate.  Plaintiff's response at 59. Defendant disputes that transition services are required ever for children under 14. Defendant's reply at 6-7.

Turberville agreed that a transition assessment must be done by age 14, but an evaluation could be done earlier if appropriate.  HR 210-212.  The district's reason for not doing one at the time of the hearing was that they were not required to do so until age 14.  HR 211.  No goals had been designed to assist Kyle with learning self help skills like dressing.  HR 215.  No functional assessment had been done.  HR 215. Dr. Waddell testified that with someone with such a low IQ, an appropriate

_____

[27]Under 34 C.F.R. § 347(b)(1), which was in effect until October 1, 2006, the relevant language read, "For each student with a disability beginning at age 14 (or younger, if determined appropriate by the IEP team...)"  When that regulation was amended, the language was changed to "[b]eginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team..."  *See* 34 CFR § 300.320 (b) (2006).  The court notes that the plaintiff quoted the regulation in effect at the time the hearing decision was entered.

curriculum would be self-care, rather than an emphasis on learning to read or do simple math.  HR 2321.

Box also agreed that there were no transition goals or objectives stated for Kyle.  HR 743.  She testified they are usually added to an IEP at age 14, but agreed they could be added before then if necessary.  HR 744.  Burgess stated a transition plan had to be in place by age 14, and from the records she had seen, nothing had been done for this yet.  HR 1846.

The hearing officer opined that the educational benefit provided to Kyle was de minimus and did not meet the threshold stated by *Board of Education Hendrick Hudson School District v. Rowley*, 458 U.S. 176 (1982).  Hearing Officer ("H.O.") decision at 54-55.  Having found Kyle's education to be lacking, the hearing officer concluded that Kyle needed services that would allow him to function when he completed his education.  H.O. decision at 55.  He noted that whether these services be called transition services or something else, in the facts of this particular case, such services were appropriate and should have been considered by the IEP team beginning with the 2003-2004 school year.  H.O. decision at 56.  The denial of such services violated Kyle's right to a FAPE.  H.O. decision at 56.

Given all of the testimony adduced at the hearing, as well as all of the evidence submitted, the court finds no error in this conclusion of the hearing officer.  While

federal law does not mandate inclusion of transition services until age 16, the law clearly does not prohibit such inclusion earlier. The court is of the opinion that such services were appropriate for inclusion in the IEPs, particularly in light of Dr. Waddell's testimony that an appropriate curriculum would focus on self-care.

### 3. Whether the hearing officer committed reversible error in allowing the hearing to proceed where the plaintiff failed to comply with the pre-hearing order to submit copies of all documentary evidence and a list of witnesses and the gist of each witness's testimony at least 5 days prior to the hearing date

Defendant complains that the plaintiff did not follow this instruction. Rather, the plaintiff submitted a partial list of witnesses but no documents three days before the hearing. When the defendant raised this with the hearing officer, the hearing officer stated these were notice requirements, and that the defendant did not show any prejudice. The defendant asserts AAC 290-8-9-.8(c)(4)(iii) requires the 5 day rule and that nondisclosed evidence is prohibited. Defendant moved to dismiss the case altogether, based on his assumption that the plaintiff would be barred from introducing any evidence. HR 17-26.

The defendant later states that the hearing officer allowed these witnesses because they were actually listed on defendant's witness list and therefore could not be a surprise to defendant. The defendant disputes this because it did not know what the witnesses would say (defendant's brief at 35).

42

The plaintiff states this was due to a miscommunication about when the hearing would actually start.[28]  Plaintiff's response at 64; see HR 9-15.  Defendant moved to dismiss the hearing because plaintiff's witness list was late.  Plaintiff asked to continue the hearing to cure any defect, but the defendant refused.  HR 48.  As a remedy, the hearing officer only let the plaintiff call witnesses from the defendant's witness list for the first two days of the hearing.  HR 13-14.  Whether to bar non-disclosed evidence is discretionary with the hearing officer.  *See* 34 CFR § 300.512(b)(2) (2006).[29]

The hearing officer stated, after listening to both sides' arguments, that the five day rule is a notice requirement, so there are no surprises, and a party cannot be surprised by the other side calling a witness the other party intended to call anyway. HR 40.  The hearing officer further stated that disclosing what the witnesses will say

---

[28]Plaintiff pointed out during the hearing that up until a week before the hearing, she thought Donald Sweeny was defendant's counsel.  HR 27.  The week prior to the hearing, Stanley Munsey, who appeared as counsel for defendant during this time period, was on vacation. HR. 28.  Plaintiff's counsel thought that her request for continuance had been granted because she wanted to have plaintiff's expert observe Kyle and Turberville had stated that the Friday selected prior to the hearing was not a good date.  Thus, not hearing from Munsey and knowing that the observation was put off, the plaintiff wrongly assumed the continuance had been granted. HR 28-30.
    The hearing officer told defense counsel that defense counsel was the one who did not notify anyone he was the attorney for the school system, the one who was on vacation the week before the hearing, and the one who insisted the hearing go forward on that day, and thus his "hypertechnical arguments" were not well-taken.  HR 46-48.

[29]At the time of the hearing this same language appeared in 34 CFR § 509(b)(2).

is a rule that is largely ignored, because all witnesses testify to the overall issue in every case, that being whether the school district has provided a FAPE.  HR 41.

After further argument from defense counsel, the hearing officer stated that "you're ignoring the fact that we communicated almost every day since Monday about the fact that we had this misunderstanding, and that she was – Monday, when I told you I was granting – or denying her motion for continuance, I told you that I was going to allow her to call witnesses off of your list."  HR 63.  Throughout the hearing, defense counsel objected to any witness not disclosed five days prior to the start of testimony in October 2004.

Given the facts and background of this case, the court finds no error in the hearing officer's decision to allow witnesses to testify disclosed less then five days prior to the start of the hearing.  Bolstering the court's opinion is the fact that after the defendant sought and received the first hearing officer's recusal, both parties consented to continuing the hearing with the record as it stood.  HR 675-676.  Had the defendant actually suffered prejudice from the lack of five days notice concerning the plaintiff's calling witnesses employed by the defendant school system, the defendant could have and should have requested the second hearing officer to exclude the first two days of testimony.[30]  This did not occur.

_____

[30]At one point, defense counsel stated that he would not ask the hearing officer to recuse himself, stating, I am not in favor of your recusal.  I like the Record just the way it is."  HR 607.

**4.   Whether the hearing officer committed reversible error in allowing plaintiff to introduce the letter of Dr. Bruce Laughlin, which defendant objected to as hearsay.**

During the hearing, Julie Box testified that she thought Kyle's physical condition was deteriorating. HR 994-995.  Plaintiff thereafter introduced a letter from Kyle's pediatrician, dated 5 days after Box's testimony, stating Kyle's condition had not changed.  Defendant asserts this letter is hearsay because Dr. Laughlin was not present at the hearing.  *See* defendant's brief at 10; plaintiff exhibit 10 to hearing, submitted as exhibit E to defendant's brief.  The defendant asserts this and much of plaintiff's other testimony were "untruths" designed to prejudice the hearing officer and reason enough to reverse his decision.

The plaintiff states that Kyle did deteriorate physically, as noted by Box, because he had outgrown his wheelchair and the defendant did nothing to replace it.  Plaintiff's response at 13, 34.  The defendant asserts that because Kyle needed a wheelchair all the time, and not just at school, the defendant did not have to provide one as it did not fit the category of a special accommodation to allow Kyle to attend school.  Defendant's brief at 70, citing *Kerry M., et al. v. Manhattan School District # 14*, 46 IDELR 194 (N.D.Ill.2006).  However, the specific issue of whether the defendant had a duty to provide an appropriate wheelchair for Kyle was never addressed by the hearing officer.  Thus, the court considers only whether the

45

admission fo Dr. Laughlin's letter requires this court to reverse the decision of the hearing officer.

The plaintiff asserts the admission of Dr. Laughlin's letter was within the discretion of the hearing officer.  Plaintiff's response at 69-70, citing to AAC 290-8-9-.8(8)(c)8.(i)(XVII) and 290-8-9-.8(8)(c)8.(iii).  The plaintiff also asserts that the letter was admissible as an exception to the hearsay rule under FRE 803(6), arguing that it was a "note ... created in the ordinary course of business."  Plaintiff's response at 70.  The plaintiff argues the letter is also admissible under FRE 803(4), which states that statements made for purposes of medical diagnosis and treatment, which describe medical history or past or present symptoms are excluded from hearsay.  Plaintiff's response at 71.  Furthermore, the plaintiff alleges that case law recognizes hearsay evidence in administrative hearings is sometimes appropriate, citing *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court is of the opinion that the letter from Dr. Laughlin, inadmissible hearsay or not,  certainly did not prejudice the defendant.  Rather, the hearing officer accepted Box's testimony as true, stating "[a]s Petitioner's special education teacher testified, he is deteriorating in his gross and fine motor skills."  H.O. decision at 60.  Given this finding, the letter from Dr. Laughlin certainly did not "confuse the H.O.

and Defendant" as represented by the defendant.[31]  Defendant's brief at 11.  As such,

the court finds no error requiring that the hearing officer's decision be set aside based

on the admission of the three line letter provided to the plaintiff by Dr. Laughlin. *See*

exhibit D to defendant's brief.

**5.  Whether it was reversible error to allow plaintiff's attorney's statements regarding what witnesses Barbara Burgess and Dr. Ellen Spence[32] would say because that language did not appear in the report of those two witnesses .**

The defendant seems to complain that plaintiff's counsel was allowed to

summarize what she believed the two reports at issue stated.  *See* HR 603-604;

plaintiff's brief at 72.  The statement by plaintiff's counsel, in context, is as follows:

> MS. TURBERVILLE: May I – I do have one thing to say – at this point when I last testified, I did not have Dr. Spence's evaluation at that time.  And after I got that, I now – there is an IQ in there.
> MS. MATTISON: Let me –
> MS. TURBERVILLE: Part of that, those questions – we were waiting on the evaluation.
> I shouldn't be defending myself.
> MS. MATTISON: Just so that you're not surprised, let me tell you that Dr. Spence, if you read her report carefully, is not prepared to testify that that's his IQ.  What she will say is that it was hard to get an IQ on him, and that she does not – she will not take the

---

[31]The defendant also asserts that the letter was for the purpose of "utter deceit to say the least."  Defendant's brief at 11.  Clearly, given that the hearing officer accepted Box's testimony as true, he was not deceived by the plaintiff's offering of the letter.  Additionally, the court cannot determine if the defendant is suggesting that Dr. Laughlin, whose deposition the defendant has offered as evidence to this court, conspired with the plaintiff on the alleged deceit by providing a letter to refute Julie Box's testimony.

[32]Dr. Spence prepared a report, HR 1747, but never testified.

position that he's mentally retarded.  In fact, I think the report,
itself – just so  that you're not surprised – says that that is an
estimated low – I mean, that would be a minimal, but that she
definitely believes he may not be.  That's what she'll testify to.
Barbara Burgess – she didn't say this in the report,
but I'm just sharing it with you – does not think that he –
if he has any mental retardation, she doesn't think that it's
much at all.  So, just FYI.

HR 603-604.  The court finds this statement was not offered by the plaintiff's counsel

for any improper purpose.  In fact, the transcript reflects that this exchange was not

offered as testimony, or during testimony.  Rather, it seemed to have been more for

the purpose of the parties discussing upcoming testimony for the purpose of planning.

Immediately following these statements by Ms. Mattison, she states that if Ms.

Turberville and Mr. Munsey would like to talk to Barbara Burgess regarding her

opinion of Kyle's intelligence, that is fine by her, even though Ms. Burgess is a

plaintiff's expert.  HR 604-605.  From the hearing officer's next statement, he

apparently was not listening to this entire exchange, but rather contemplating whether

to recuse himself.  HR 606-607.

Defendant also asserts the somewhat related argument that the written report

of Barbara Burgess was admitted into evidence over defendant's objection, HR 300-

308, which defendant argues violated AAC 290-8-9-.8(8)(c)4.(vi).  That AAC section

stated that all evaluations completed by five business days prior to the hearing should

be provided to any opposing party.  *Id.*  However, that section also states a hearing

officer "may" bar the use of such evidence otherwise.  The court finds that section

clearly leaves the decision whether to allow evaluations not provided in strict

accordance with this rule to be discretionary with the hearing officer.

The record also clearly reflects the report was admitted for the purpose of Vicki

Turberville testifying to why she disagreed with it.  HR 300-308; plaintiff's exhibit

3. Defendant's statements in its brief otherwise are a gross mischaracterization of the

record.  Defendant's brief at 13.  The actual exchange between counsel and the

hearing officer regarding the admission of this report was as follows:

> MR. MUNSEY: We object to the introduction of [the independent
>     educational evaluation] on the Record.  Hearsay.
> MS. MATTISON: We move for the admission of it as an exhibit.
> MR. MUNSEY: Requires an agreement.  The person is not present.
>     ....
> THE HEARING OFFICER: What is the purpose of asking about this?
>     Are you offering – you can't offer this for expert testimony
>     without it being subject to cross-examination.
>     ....
>     There is no exception to that extent.
>     ....
>     Are you offering it for the purpose of --
> MS. MATTISON: Impeachment right now.   Ms. Burgess will be
>     testifying.  But right now, it's for --
> THE HEARING OFFICER: Mr. Munsey, I never allow any report from
>     the expert to be offered for what it contains without the expert
>     being subject to your cross-examination.  But I'll allow her to
>     offer it for this limited purpose.
> MR. MUNSEY: And the purpose is what? I'm sorry.  I missed it.
> THE HEARING OFFICER: You said that it's for impeachment?
> MS. MATTISON: Right.  And I'm also going to ask her whether she
>     agrees or disagrees with any aspect of this report.   But I

> understand whether these statements in this are correct need to come from Ms. Burgess, and they will.

HR 300-302.

Turberville testified to the content of Burgess' report solely to the extent of why she thought it was incorrect.  HR 300-312.  She criticized Burgess for stating both that Kyle should be evaluated to find the most appropriate communication device and that one should be purchased for him immediately.  HR 313.  She also thought the school should get to explain reasons for Burgess' statements regarding what she observed.  HR 319.

A parent has the right to an IEE at the district's expense, unless the district can prove its evaluations were appropriate.  34 CFR § 300.502.  However, the defendant refused to pay for Burgess' evaluation because it claimed it was not based on a "typical day" because Kyle's regular education teacher was absent that day.  HR 291-292, 309.  The hearing officer ruled in defendant's favor on the issue of whether to pay for Burgess' evaluation, holding that the defendant's refusal to pay for the same was not wrongful.  H.O. decision, at 65, specific finding number 7.

Although the court is not sure which of the above three issues the defendant actually meant to address in its contention number 5, the court is of the opinion none of the issues were improperly decided by the hearing officer.  The statements of plaintiff's counsel did not appear to have been considered by the hearing officer, and

if anything, were beneficial to the defendant, who argued throughout the hearing that Kyle was mentally retarded. During the hearing, Burgess never stated the opinion that plaintiff's counsel attributed to her in the contested statement. Additionally, Dr. Spence never testified. Clearly, plaintiff's counsel's statements did not prejudice the defendant in any way.

Regarding the admission of the report for the purpose of impeachment of Turberville, the court finds no prejudice to the defendant for defendant's special education coordinator to testify as to why she did not think Burgess' opinions were correct. Had the hearing officer not allowed it, the plaintiff merely would have had Barbara Burgess testify and then recalled Turberville to the witness stand to state the exact same opinions she stated.

### 6. Whether the hearing officer was wrong to conclude the defendant failed to evaluate the child and ordering a reevaluation pursuant to 34 CFR §300.536.[33]

---

[33]Defendant asserts this citation by the hearing officer was erroneous (submitted by defendant as exhibit f). Plaintiff asserts that the regulation as it existed in 2005 is what the hearing officer was referring too, and the defendant is confused about this. Plaintiff's response at 29. The section referenced by the hearing officer, at the time the decision was entered, read, in relevant part,

Each public agency shall ensure:

(b) That a reevaluation of each child, in accordance with §§ 300.532-300.535, is conducted if conditions warrant a reevaluation, or if the child's parent or teacher requests a reevaluation, but at least once every three years.

34 CFR § 300.536(b). The court finds nothing erroneous about this citation. This section has been reworded and is now contained within 34 CFR § 300.303.

Defendant asserts reevaluations are governed by AAC 290-8-9.-2(5)(a)-(e). According to defendant this regulation only requires reevaluations if requested by the parents or deemed appropriate by the IEP team, neither of which occurred in defendant's view.   *See* defendant's brief at 15.[34]   However, the testimony was undisputed that the defendant never completed any comprehensive evaluation of Kyle prior to the hearing, as required by 34 CFR §§ 300.320, 300.531, *et seq*.  Therefore, it had a duty to conduct the triennial evaluation required in ACC 290-8-9-.2(5)(b). That section of the AAC clearly states that "[e]ducation agencies must ensure that all children with disabilities are reevaluated every three years .... A reevaluation may be conducted more frequently if conditions warrant...."  Due to the defendant's failure to comply with this law, there was no error in the hearing officer's decision requiring defendant to comply with the law.

Additionally, plaintiff asserts that Kyle needed a comprehensive evaluation to develop an appropriate program, and not just to see if he was eligible for services under IDEA.  Plaintiffs' response at 28.  Plaintiff asserts that the district failed to both comprehensively evaluate Kyle and to reassess his needs, thus further evaluations were necessary to develop an appropriate IEP.

---

[34]See Specific Finding 1, Hearing Officer decision at 63.

The hearing officer succinctly stated that the law required triennial evaluations, and the evidence clearly reflects that this was not done.  Hearing Officer decision at 49-50.   The court finds no error in this conclusion.

**7.   The hearing officer's decision ignored testimony regarding evaluations for assistive technology devices and erred in directing the school system to provide the child with any item, piece of equipment or product system that the evaluation determined may be used to increase, maintain, or improve the functional capabilities of the child.**

The defendant asserts that the hearing officer's finding that the school system failed to evaluate Kyle for adequate assistive technology devices was wrong, because the defendant has already done two such evaluations and plaintiff just did not like the results of it, and further, the defendant argues that the hearing officer did not limit this to items found appropriate by the IEP team (defendant's brief at 16-17).[35]

The plaintiff argues that the October 31, 2003, consultation with TASC by Box was insufficient under the IDEA and 34 CFR § 300.532 (currently 34 CFR § 300.304) as an assessment for a communication device.  The testimony was undisputed that the TASC consultant, Lisa Snyder, never evaluated or observed Kyle.  HR 863.  Rather, Box told Snyder that Kyle was not able to use the Vanguard, even though she had

---

[35]Specific Finding 2, Hearing Officer's decision at 63.  The defendant further argues that this finding of the hearing officer is "a good example of what Defendant has described as the H.O.'s zeal to find everything in favor of the Petitioner in these due process hearings." Defendant's brief at 18.  The court notes only that the hearing officer ruled in favor of the defendant on two of the eight issues.

never seen Kyle with it.  HR 864-865.   Based on the information Box provided, TASC recommended Kyle should use the Step-by-Step until the Vanguard could be reintroduced.  HR 865; plaintiff's exhibit 2.

The IDEA requires schools to ensure assistive technology devices and services are available to a child who needs them.  34 CFR § 300.308 (currently 34 CFR § 105).  *See also* 20 USC § 1401(2); 34 CFR § 300.6.  Such a requirement includes evaluation of the need for devices, procuring the devices, coordinating their use in therapy and education and training children and their educators to use the devices, 20 USC § 1401 (1)-(2).  The required evaluation must include a functional evaluation of the child in the child's customary environment.  34 CFR § 300.6.  From the hearing transcript, the court can find no evidence that such an evaluation was ever done.  Rather, Robin Butler had a sales consultant familiar with the Vanguard Kyle's mother had purchased come to Kyle's home in the summer of 2003 because the plaintiff requested further training with the Vanguard.  Then, several months later, in October 2003, Box and Bowen consulted with someone from TASC, who had only Box's and Bowen's representation as to what Kyle could and could not do.  Neither of these events constitutes as "functional evaluation."

The hearing officer found that the failure to provide an evaluation of Kyle for purposes of an augmentative communication device was a violation of the law,

54

specifically 34 CFR § 300.6.[36]  Hearing Officer decision at 51-52.  The court finds no

error in the hearing officer's decision.

### 8. Whether the hearing officer's decision that the defendant failed to provide Kyle with occupational therapy and that it did not conduct an appropriate occupational therapy evaluation were erroneous[37]

The IDEA requires "related services," which includes development, corrective

and other supportive services, such as occupational and physical therapy.  20 U.S.C.

§ 1401(26)(A).  By law, denial of such services violate a child's right to a FAPE.  *See*

20 U.S.C. § 1401(9).

The hearing officer concluded that the failure to conduct an occupational

therapy evaluation was a denial of a free appropriate public education ("FAPE").  The

defendant asserts that Kyle was receiving occupational therapy by defendant's

occupational therapist assistant and that evaluations were done by Britta Hughes, an

occupational therapist.  Defendant's brief at 21-22.  According to defendant, the

hearing officer had the evaluations (hearing exhibit 13).  However, Dr. Rowe testified

that she spoke with Hughes and Hughes acknowledged she had not assessed Kyle's

need for technology and not attempted to use assisted technology in the classroom.

---

[36]The hearing officer incorrectly cited this section as "34 CFR §300.106."

[37]Specific Finding 3, Hearing Officer's decision at 63.

HR 1585.  Dr. Rowe testified that the 30 minutes a week that Kyle received in occupational therapy was good, but that he really needed more.  HR 1568.

Dr. Rowe made six recommendations for providing basic technology to Kyle to allow him independence in eating, going to the bathroom and other basic activities. HR 1624.  Dr. Rowe testified that an orthopedic evaluation should have been done after the fracture of Kyle's leg.  HR 1611.  She testified that an occupational therapy evaluation should have been conducted every year, beginning in kindergarten.  HR 1692.

The defendant also states that Kyle received these services through defendant for years and that the plaintiffs were confusing an "appropriate education" which defendant provided, with the "best possible education" which defendant had no obligation to provide.  Defendant's brief at 23-24, citing *Brd. of Ed. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034 (1982).

The hearing officer opined that the defendant failed to make any effort to coordinate the occupational therapy Kyle received with any of his educational program or his need for assistive technology.  Hearing Officer decision at 53.  This finding was clearly supported by the testimony and evidence at the hearing. Therefore, the finding that the occupational therapy services Kyle was receiving were

insufficient was well supported in the record.  The court finds no error in this conclusion.

**9.  The defendant argues the hearing officer was wrong to conclude that Kyle was entitled to 17 months of compensatory education and failed to account for the parents' culpability for Kyle missing school without a doctor's excuse.**

The defendant argues the hearing officer could have only reached this conclusion by believing the plaintiff's testimony. Defendant's brief at 24.[38] Defendant in the same sentence says this is moot anyway since Kyle died.

This issue concerns whether Kyle received adequate "homebound" schooling after he was injured in March 2002 when his aide slipped while holding Kyle and he was injured.  Defendant argues Kyle received the education he was supposed to during this time, but Kyle's mother failed to comply with board policy and it was "out of the goodness of her heart that ... the ... Special Education Coordinator ... rendered any services to Kyle in the homebound setting rather than report Mrs. Wilson to the juvenile authorities for allowing the truancy."  Defendant's brief at 26.

Plaintiff argues that defendant should have done an IEP for the period Kyle was entitled to homebound schooling, but only received inadequate and sporadic services.  Plaintiff's brief at 8, citing HR 1412, 1465-68, 1472-77. *See also* plaintiff's

---

[38]Specific Finding 8, Hearing Officer's decision at 65.

brief at 53; citing 34 CFR § 300.343(c) (currently contained in 34 CFR § 300.324).

 The hearing officer agreed, noting that

> Perhaps the most disturbing aspect of this case concerned the period after Petitioner sustained a broken leg in a fall at school.  That event occurred in March, 2002.  Afterward Petitioner was hospitalized for approximately three weeks.  He was then sent home to recover.  He was in a full body cast.  His mother testified that Petitioner was heavily medicated.  Despite that situation no IEP was developed to provide petitioner educational services for the remainder of the school year.  Instead, Petitioner's aide was sent to his home each morning to assist in his care.  The aide was a medical care worker.  She was not a teacher.  She was not a paraeducator.  She had no qualifications that would allow her to provide educational services to the child.  Thus, Petitioner was deprived of a free appropriate public education from March 2002 through May 2002.

Hearing Officer decision at 58.

Burgess testified that Kyle should have at least two years of compensatory education to make up for the past two IEP's which she considered inappropriate.  HR 1850-1851.  Compensatory education is to make up time lost due to the defendant's failure to deliver a FAPE.  *Reid v. District of Columbia*, 401 F.3d 516 (D.D.C.2005); *JeffCo. Brd. of Ed. v. Breen*, 853 F.2d 853 (11th Cir.1988).  According to plaintiff, IDEA requires an IEP be redesigned any time a student required a change of placement, including a homebound placement.  Plaintiff's response at 54, citing 34 CFR § 300.552 (2005) (currently 34 CFR § 116) and § 300.551(b)(1) (2005) (currently 34 CFR § 300.115).

The hearing officer concluded that the failure to convene an IEP team for the period that Kyle was eligible for homebound services deprived Kyle of a FAPE. Hearing Officer decision at 58.  The hearing officer therefore ordered the defendant to begin providing Kyle compensatory services at the age of 21, unless the defendant desired to begin the same sooner.  Hearing Officer decision at 65.  Given the testimony of what services, or lack thereof, Kyle did receive while he was recovering from his injuries, the court is of the opinion that this conclusion is supported by the evidence and testimony of record.

### 10.  Whether the hearing officer committed error by allowing Kyle to receive physical therapy if his parent "desires physical therapy."

According to defendant, whether to provide physical therapy services is a decision of the IEP team, of which the parent is only one member.  Defendant's brief at 30**.**  The plaintiff points out that full parental involvement is required under IDEA. *See Doe v. Ala. State Dept. of Education,* 915 F.2d 651, 661 (11th Cir. 1990).  The plaintiff asserts this finding should be affirmed.  Plaintiff's response at 38.  The plaintiff states that while defendant is correct that an IEP team is supposed to identify a student's needed services, the defendant ignores that the purpose of a due process hearing is to override an IEP team's decision.  Plaintiff's response at 38-39.  The plaintiff states that physical therapy is a "related service" under 34 CFR §

300.28(b)(8)[39] and it is completely appropriate for the hearing officer to award such services.

Regardless of the parties' arguments otherwise, the hearing officer actually included the statement "if his parent desires, physical therapy" as part of his specific finding that the plaintiff was entitled to compensatory education. See Hearing Officer decision at 65. This finding was based on Box's testimony that the plaintiff stated at the 2004-2005 IEP meeting that she did not want Kyle to have physical therapy because of his fragile state at that time. HR 896. The prior year, Kyle had physical therapy outside of the school setting. HR 896-897. Finding that the hearing officer's decision to award compensatory services is supported by the record, and further finding that the plaintiff has previously declined physical therapy services from the defendant, the court is of the opinion this six word phrase, as it appears in the Hearing Officer's decision, is appropriate. The parties' arguments, particularly the defendant's, remove this phrase from the context in which it is found. The court finds that the six words in question, taken in the context in which they appear, are supported by the evidence and testimony in the record.

---

[39]The correct citation of the section as it existed in 2005 is 34 CFR § 24(b)(8), which is ow found at 34 CFR 300.34(c)(8).

**11.  Whether the hearing officer committed error in allowing the testimony of Barbara Burgess and Jan Rowe, and allowing reports of these witnesses into evidence although the reports were prepared after the date the hearing began.**

This argument by defendant is a continuation of the argument that the parties were supposed to submit their evidence and witness lists not less than five days prior to the date of the hearing.  The defendant additionally asserts these reports were actually evaluations and AAC 290-8-9-.08(8)(c)(4)(vi) requires all evaluations to be completed prior to 5 days before the hearing.  Defendant's brief at 31-32.

Defendant argues these witnesses were allowed because they were on defendant's witness list, but states that this was still unfair because defendant did not know what these witnesses would say.  Defendant's brief at 35.  However, defendant then states that it did not know anything about a witness the requisite five days prior to the hearing.  Defendant then faults plaintiff for stating that plaintiff did write a letter stating which of defendant's witnesses she was going to examine, but she did not subpoena them so it was wrong for the hearing officer to allow these witnesses.  Defendant's brief at 36.  Defendant's argument is confusing, to say the least.

As the court understands it, this argument concerns the testimony and reports of Barbara Burgess and Jan Rowe.  *See* plaintiff's response at 73.  In regard to the 5 day rule, plaintiff points out that both of these witnesses were listed on the witness list of October 25, 2004.  Burgess actually testified on March 24, 2005, and Rowe on

March 14, 2005.  Plaintiff's response at 74.  On the October 25, 2004, list, plaintiff states that evaluations and/or reports may be forthcoming, which is permissible pursuant to 20 USC §1415(f)(2)(A).  AAC 290-8-9-.8(8)(c)4(vi) also contains language which requires, five days prior to a hearing, "all evaluations completed by that date."  The court finds nothing improper about the hearing officer permitting the use of these evaluations at the hearing.

The defendant possibly also asserts that the plaintiff's experts should not have observed Kyle at school, but the defendant provides no legal authority for its assertion that the observations were in violation of FERPA or contrary to IDEA. Furthermore, the defendant did not raise this objection at the time of the hearing.  The court finds this argument, not having been raised when the testimony and evaluations in question were admitted into evidence by the hearing officer, has been waived.

**12.   Whether it was reversible error for the hearing officer to "nearly ignore the entirety of the testimony offered on behalf of the school system and giving credence to the biased testimony of Mrs. W...."**

This issue raised by the defendant seems to be that the defendant did not like the plaintiff's testimony.  See defendant's brief at 37.  This is also an argument regarding the credibility of witnesses.  Much of this testimony has to do with when Kyle was injured March 2002, leaving him in a body cast for several months and after

which his right leg was shorter than his left and he lost functioning he had prior to the accident, according to his mother.  HR  1454-1458, 1462-1464, 1974.

Because the hearing officer questioned the witness about the accident, the defendant concludes that the only way for the hearing officer to have known about it was through an *ex parte* communication.[40]  The record clearly refutes this assertion, and demonstrated that the defendant had no objection to the hearing officer's questions at the time.  HR 1462-1467.  Defendant refers to all of this as "deceit perpetuated on the H.O."  Defendant's brief at 42.

The plaintiff more succinctly phrases this issue as whether the hearing officer's finding that defendant denied Kyle an FAPE should be affirmed.  Plaintiff's response at 40.  Under *Rowley*, 458 US 176 (1982), the Supreme Court set forth guidance for determining if a student is receiving a FAPE.  One inquiry is whether the student's IEP is reasonably calculated to enable the child to receive an educational benefit. That standard has been refined to require more than a *de minimus* benefit.  *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3rd Cir.1988); *Timothy W. v. Rochester, N.H. School Dist.*, 875 F.2d 954 (1st Cir.1989); *Chris D. v.*

---

[40]The actual details of the accident suffered by Kyle while at school are irrelevant to the issue before the court.  Regardless of how the injury occurred, or the extend of the injuries to Kyle, the only relevant issue from the accident is whether the services provided by the school thereafter, while Kyle was kept home, were adequate to comply with the law requiring a free and public education.  Similarly, the extent of Kyle's abilities prior to the accident as compared to after the accident, is not at issue in this court's review of the hearing officer's decision.

*Montgomery Co. Brd. of Ed.*, 753 F.Supp. 922 (M.D.Ala.1990).  Given the totality of the testimony regarding the services Kyle received while at home for the remainder of the 2002-2003 school year, and continuing through the entire 2003-2004 school year, the court is of the opinion that the hearing officer did not err in the weight he assigned to the various witnesses.

The defendant also argues within this contention that Kyle was severely mentally retarded.  Defendant's brief at 53.   The defendant apparently attempts to assert that Kyle was uneducable because he was so retarded, but what the defendant actually wrote is that "[t]here being no credible evidence that Kyle could – was mentally capable of – receiving education benefit is totally lacking in the record." Defendant's brief at 53.   The argument is then put forth "Contrary to the overwhelming, credible evidence in the hearing transcript, not only did the LEA conduct pertinent evaluations, it had pertinent evaluations done by outside professionals."  Defendant's brief at 54.

The plaintiff states that the program defendant designed failed to comply with the most basic of IDEA requirements.   The plaintiff argues that the defendant assumed Kyle was severely mentally retarded and did things only to occupy time, rather than educate him.  Plaintiff's response at 2.

The court finds no error in the opinion of the hearing officer regarding remedies for defendant's failure to comply with the various provisions of the IDEA and its implementing regulations.  Defendant's arguments regarding the evidence and the alleged lack of veracity is simply not supported by the record.  For example, while the defendant spends several pages in its brief regarding the plaintiff's testimony concerning Kyle's ability to stand, there was no conflict between the plaintiff's testimony at the hearing and the evidence the defendant now wants the court to consider.  No one testified at the hearing that Kyle could stand unattended.  The fact that no one believed Kyle could stand unassisted does not conflict with testimony that he stood with the assistance of a stander or holding his mother's legs.

### 13.  The hearing officer's decision is entitled to deference but should not be given it because his bias is patently evidenced by his findings in the face of the more credible evidence from the defendant's witnesses[41]

---

[41]Defense counsel accused the first hearing officer of bias.  HR 295-296, 307-308, 555. At the end of the second day of testimony, the first hearing officer told the superintendent of the school system that defense counsel was "trying to bankrupt your school system."  HR 553.  He further told Munsey that "you are the most uncooperative attorney I have encountered in 20 years –" HR 552.  The hearing officer then concluded that Billy Hudson committed perjury in denying a statement that Hudson made to the hearing officer and believed the best remedy was to recuse himself.  HR 596-599.  According the decision entered by the second hearing officer in this case, a formal request for recusal by defendant's counsel was made January 19, 2005, and granted that same date.  Hearing Officer decision at 2.  Defense counsel thereafter agreed to continue with the record like it was rather than have the witnesses who gave their testimony with the first hearing officer repeat it for the second hearing officer.  HR 675-676.

Having procured a second hearing officer, defendant is apparently accusing him of bias as well.

This is yet another argument on the credibility of witnesses. Defendant's brief at 55. Defendant asserts that the court should make an independent decision based on a preponderance of the evidence while giving due weight to the administrative proceedings, citing *Doyle v. Arlington County School Board*, 953 F.2d 100, 103 (4th Cir.1991). The administrative proceedings are entitled to a presumption of correctness as long as the findings were "regularly made." *County School Board of Henrico Co., VA v. Z.P. ex rel R.P.*, 399 F.3d 298, 305 (4th Cir.2005), citing *Doyle*, 953 F. 2d at 105. That being said, the defendant argues that the findings of the hearing officer do not reflect the testimony of the defendant educational witnesses. Defendant argues the hearing officer failed to give deference to their views as professional educators. Specifically, the defendant argues that the hearing officer should have accepted Box's testimony that in her opinion, Kyle had an IQ in the 40-50 range.[42] HR 915.

The plaintiff notes that the defendant objects to consideration of any testimony as credible other than that of its own witnesses and labels every one else as a "liar."

---

[42]Defendant states Ms. Green's testimony that Kyle had the coloring ability of a kindergartner supports Box's conclusion. Defendant's brief at 56. This is not particularly helpful to the defendant, given that everyone testified Kyle had trouble grasping anything, and more importantly, because Ms. Green testified she did not believe Kyle was mentally retarded. HR 1095, 1110.

Plaintiff's response at 46-47.  The court finds this to be an accurate description of defendant's argument.

Defendant argues that the hearing officer had to render a statement of facts on which he based his decision, pursuant to AAC 290-8-9-.8(8)(c)8.(iv)(I)II, but instead just reiterated testimony from (plaintiff's) witnesses.  Defendant also argues that the hearing officers did not know anything about IDEA requirements.  Defendant's brief at 61.[43]  The court notes the hearing officer's decision contained a section entitled "Statement of Facts."  H.O. decision at 6-49.  In these 43 pages, the hearing officer carefully summarizes and details each of the witnesses' testimony.  Having reviewed the facts as set forth by the hearing officer, the court finds they accurately reflect the testimony from the hearing.

### 14.  The hearing officer erred in his ruling that the burden of proof in the due process hearing was on the defendant

Defendant asserts that plaintiff's counsel and the hearing officer, in other hearings, had agreed that the burden of proof was on the school system, but could cite

---

[43]Although defendant represents in its brief that the first hearing officer, John Green, was fired, a reading of the record does not support this conclusion.  Rather, being a witness to perjury by the district superintendent, the first hearing officer comes to the conclusion that he needs to recuse himself.  HR 596-607.  The defendant apparently also filed a motion seeking to have Mr. Green recuse himself, which Mr. Green did.  In defendant's counterclaim (doc. 9), defendant asserts that this hearing officer was thereafter fired by the State Department of Education as a result of the hearings conducted by Mr. Green in this case.  Although interesting, these allegations are wholly unsupported, inappropriate and irrelevant to the issues before this court, beyond the obvious conclusion that any prejudice against the defendant from Mr. Green was cured when the second hearing officer, Wesley Romine, was assigned to replace him.

no law that said this.  Defendant's brief at 61.  *See* HR 2010-2011.  Defendant next states that this standard does appear in AAC 290-8-9-.8(8)(c)(6)(ii)(I), but only one time.   Defendant also states that this burden only applies concerning the appropriateness of services proposed or provided if the school district requests the due process hearing.  Defendant cites *Schaffer, et al. v. Jerry Weast*, 546 U.S. 49, 126 S.Ct. 528 (2005) for the proposition that the burden lies on the party seeking relief. *See also* 5 U.S.C. § 556(d) (same burden stated under the APA).

The AAC states that an education agency's responsibilities for impartial due process hearings include assumption of the burden of proof regarding the appropriateness of services proposed or provided.  AAC 290-8-9-.8(8)(c)(6)(ii)(I). The defendant's argument that this only applies when the school system has requested the due process hearing is not supported by the administrative code.   Under the preceding section, labeled "Parents' Responsibility in Impartial Due Process Hearing Procedures," is the requirement that the parents "present their case at the hearing." AAC 290-8-9-.8(8)(c)(5)(ii).  The assumption of the burden of proof appears solely under the education agencies' hearing responsibilities, regardless of who requested the hearing.

On July 1, 2005, after this hearing concluded and the hearing officer's decision was entered, the standard was revised from placing the burden on the school district

to prove the appropriateness of services, to placing the burden on the party filing the hearing request to prove the allegations.  AAC 290-8-9-.08(8)(c)(6)(i)(I).  The case of *Schaffer v. Weast, supra*, followed in November 2005.  In that case, the Supreme Court stated that the burden of proof in an administrative hearing lies with the party seeking relief.  *Schaffer*, 126 S.Ct. at 537.  The plaintiff asserts that since the decision in this case was issued by the hearing officer on May 13, 2005, the burden on the defendant was correct, pursuant to statute.  Plaintiff's response at 76.

The defendant concludes the decision of the hearing officer is "without support of substance, truth or fairness" and therefore should be set aside "and held for naught – overturned and dismissed."  Defendant's brief at 63.  The defendant's assertion of the plaintiff and hearing officer's "agreement" regarding the burden is not exactly accurate.  Rather, the hearing officer stated that in the Eleventh Circuit, the standard was still that the district has to prove that it provided a FAPE regardless of whether the student/petitioner even showed up for the hearing.  HR 42-44.  The record does not reflect the defendant identifying any law that contradicted the standard as set forth by the hearing officer or the AAC at the time of the hearing.

The Supreme Court has directly addressed the placement of the burden of proof on the school district.  The Court noted that:

> respondents and several States urge us to decide that States may, if they wish, override the default rule and put the burden always on the school

district. Several States have laws or regulations purporting to do so, at least under some circumstances. *See, e.g.*, Minn.Stat. § 125A.091, subd. 16 (2004); Ala. Admin. Code Rule 290-8-9-.08(8)(c)(6) (Supp.2004); Alaska Admin. Code, tit. 4, § 52.550(e)(9) (2003); Del.Code Ann., Tit. 14, § 3140 (1999). Because no such law or regulation exists in Maryland, we need not decide this issue today.

*Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 61-62, 126 S.Ct. 528, 537 (2005).

As the court reads this decision, the United States Supreme Court noted that Alabama and other states, by state regulations, placed the burden of proof on the school district, and opted not to address such statutes. An Alabama District Court thereafter found

> Thus, this action falls outside the ambit of *Schaffer* and *Devine* because at the time of the Administrative Decision, Alabama had a regulation that specifically imposed the burden of proof on school districts when parents called into question the propriety of an IEP. The Board has failed to offer any argument for the proposition that the *Devine/Schaffer* default rule takes precedence over the then-conflicting Alabama regulation; therefore, the Court will not *sua sponte* meander into such a thorny thicket to make the Board's arguments for it. The burden of proof properly rested on the Board, and it was not error of the Hearing Officer to conduct the hearing in that manner. The Board's assignment of error on this point is overruled.

*Escambia County Bd. of Educ. v. Benton,* 406 F.Supp.2d 1248, 1264-1265 (S.D.Ala.2005).

Having considered the foregoing, the court finds that at the time of the due process hearing and at the time of the hearing officer's decision, the burden of proof rested with the defendant school board. The court finds no error regarding this issue raised by the defendant.

### *Plaintiff's claim for attorney fees*

Under 20 USC § 1415(i)(3)(b), the court may award reasonable attorneys' fees to a prevailing party.  Defendant argues, among other things, that because Kyle did not return to school after the hearing, the student did not obtain any of the relief awarded and therefore is not entitled to attorney fees.  *See Drennan v. Pulaski County Special School District*, 458 F.3d 755 (8th Cir.2006).  Defendant asserts that the because the plaintiff withdrew Kyle from school in 2006 and waived special education services, the hearing officer's decision is meaningless.  *See* exhibit J to defendant's submissions.  Defendant states because Kyle did not receive any benefit from the hearing officer's decision, attorney fees could not be awarded.

Plaintiff asserts that Kyle did return to school, but as he became more ill, his mother removed him from the school physically and opted for homebound services instead.  Plaintiff's response at 81-82.  The plaintiff argues that the case was brought to challenge the defendant's failure to comply with the IDEA, including the failure to provide Kyle with an appropriate education program, and the hearing officer concluded that the defendant failed to provide proper evaluations and services to Kyle.  Plaintiff's response at 78-79.

The letter on which the defendant relies in sole support of its argument is dated August 17, 2006.  Exhibit J to defendant's submissions.  This is more than a full year

71

after the hearing officer's decision.  The court has nothing before it regarding what occurred in that intervening year and whether, in fact, Kyle continued in school for the 2005-2006 school year.

The court specifically finds that the plaintiff was indeed the prevailing party from the administrative hearing.  As such, the plaintiff is entitled to reasonable attorney fees.  However, the court shall withhold any ruling on the proper amount of attorney fees until the conclusion of this litigation.

## CONCLUSION

Having considered the foregoing, the court is of the opinion that each of the hearing officer's Specific Findings were supported by substantial evidence and appropriately entered.  Ample evidence supports the hearing officer's factual findings and conclusions of law as well.  As such, the court is of the opinion that decision of the hearing officer is due to be **AFFIRMED** and shall so rule by separate Order.

**DONE** and **ORDERED** this 17th day of April, 2008.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE